No. 58                    August 14, 2014                    461

# IN THE OREGON TAX COURT
## REGULAR DIVISION

### BETZ EVANS ASSOCIATES,
*Plaintiff,*

*v.*

### DEPARTMENT OF REVENUE,
*Defendant*,
*and*

### LANE COUNTY ASSESSOR,
*Defendant-Intervenor.*

(TC 5138)

Plaintiff (taxpayer) appealed from a decision of the Magistrate Division as to the real market value (RMV) of real property in Lane County. Taxpayer sought a reduction in the RMV that the Board of Property Tax Assessment (BOPTA) found for a house. Defendant-Intervenor Lane County Assessor (the county) argued that taxpayer did not satisfy the burden of proving a RMV for the subject house lower than that determined by BOPTA. At trial, the appraisers for both parties presented the court with conclusions as to the value of the house derived from the cost approach and comparable sales approach to valuation. Following trial, the court found that neither party had presented the court with a complete cost approach analysis. Taxpayer's analysis omitted significant costs of construction for the subject property. The county included those costs, but did not make any accounting for depreciation. The court therefore concluded a value figure given by the county for cost of construction minus an amount of 16 percent subtracted to account for depreciation.

Trial was held July 24, 2013, in the courtroom of the Oregon Tax Court, Salem.

Lawrence O. Gildea, Attorney at Law, Eugene, argued the cause for Plaintiff (taxpayer).

James C. Wallace, Senior Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant Department of Revenue (the department).

Sebastian Tapia, Assistant Lane County Counsel, Eugene, argued the cause for Defendant-Intervenor Lane County Assessor (the county).

Decision rendered August 14, 2014.

**HENRY C. BREITHAUPT, Judge.**

## I.  INTRODUCTION

Plaintiff Betz Evans Associates (taxpayer) appeals the real market value (RMV) for the 2010-11 tax year of a house owned by taxpayer, identified by the assessor as Account 1768504 (the subject house). The only question before the court is the RMV of the house itself; the value of the land the house is situated on is not at issue.

## II.  FACTS

The subject house is located on a 9.5 acre lot in a gated neighborhood outside the city of Springfield, Oregon. The subject house has 4,233 square feet of living area and makes use of high-end finishes throughout. Taxpayer contracted to have the subject house built on land that taxpayer already owned with the intention of featuring the subject house on the 2009 Home Builders Association of Lane County Tour of Homes. Taxpayer and the builder planned to share the proceeds of any eventual sale, but the contract between taxpayer and the builder provided that if a purchaser could not be found, taxpayer would purchase the subject house for the builder's cost of construction.

The builder completed construction of the subject house in July of 2009. Taxpayer and the builder placed the subject house and the underlying parcel on the market for $1,600,000 but received no offers. After unsuccessfully seeking to sell the subject house for roughly one year, taxpayer purchased the subject house from the builder for $714,000—an amount meant to compensate the builder for the cost of building the subject house, but not including any amount for the builder's overhead or profits. Taxpayer made no further effort to market the subject house and Michael Evans, a principal of taxpayer, now uses the subject house as his personal residence.

Defendant-Intervenor Lane County Assessor (the county) added the subject house to the tax rolls as new property effective January 1, 2010—the assessment date for the 2010-11 tax year. Taxpayer appealed the combined value of the subject house and land to the Lane County Board of Property Tax Appeals (BOPTA). BOPTA found a combined RMV of the subject house and land of $1,203,197—with

$132,297 attributable to the land and $1,070,900 attributable to the subject house. Taxpayer appealed the BOPTA decision to the Magistrate Division of the Oregon Tax Court. The magistrate found for the county, leading taxpayer to appeal to the Regular Division. *Betz Evans Associates v. Lane County Assessor*, TC-MD No 110329C (Oct 4, 2012). In proceedings before this division, taxpayer seeks a reduction in the RMV that BOPTA found for the house. The county argues that taxpayer has not satisfied the burden of proving a RMV for the subject house lower than that determined by BOPTA.

### III.   ISSUE

The sole issue in this case is the RMV of the subject house.

### IV.   ANALYSIS

RMV is defined as

> "[T]he amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

ORS 308.205(1).[1] The house was added as new property to the assessment roll for the 2010-11 tax year, the tax year at issue in this case. Determining the RMV of new property is necessary to calculate both the assessed value and the maximum assessed value (MAV) of new property for the tax year that it is added to the roll. ORS 308.153.

The RMV of property in a given tax year is a question of fact. As in all proceedings before the tax court, the party seeking affirmative relief has the burden of proving questions of fact by a preponderance of the evidence. ORS 305.427. Taxpayer is the party seeking affirmative relief in this case and so has the burden of proof.

Both parties rely in large part on appraisal reports prepared by witnesses qualified as experts in real property appraisal. Each appraisal witness further provided testimony at trial in support of his own appraisal report.

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

Both appraisers presented conclusions as to the value of the house based on the comparable sales approach and the cost approach.

A.  *The Cost Approach*

As was stated above, the appraisers for both parties presented the court with conclusions as to the value of the house derived from the cost approach to valuation. The cost approach assumes that the cost of construction—and thus the cost of building a substitute property with similar features—influences the value of real property. Appraisal Institute, *The Appraisal of Real Estate* 561 (14th ed 2013). The cost of construction includes both the direct and the indirect costs and is assumed to represent a "ceiling" on value, as a purchaser of real property is unlikely to pay more for an existing property than it would cost to build substantially similar property. *Id.* In a typical cost approach, the market value of real property at a given moment in time is found by depreciating the initial cost of construction to reflect age, wear, obsolescence, or other market conditions. *Id.* at 568-69.

Taxpayer's appraiser concluded that the $714,000 that taxpayer paid the builder for the house does in fact represent the actual cost of construction. In reaching this conclusion, however, taxpayer's appraiser excluded any costs attributable to the builder's overhead and profits. Taxpayer's appraiser seeks to justify this approach on the grounds that, under the depressed conditions of the real estate market in early 2010, few builders would have been able to recover their overhead costs or make a profit off of the sale of a house like the subject house.

This omission was improper. Considerations of the sort mentioned by taxpayer are more appropriately included in the adjustments for wear, tear, and market conditions that typically follow determination of the cost of construction. The builder's overhead and profit expectations are properly included in the costs of construction regardless of whether those costs can be recouped or those profits realized from the eventual sale of the property. *The Appraisal of Real Estate* at 571.

The result is, in essence, that taxpayer's cost approach double-counted the depressed state of the real estate market in early 2010. Taxpayer's appraiser provided substantial evidence supporting 8 to 16 percent depreciation for the subject house between the date of completion and January 1, 2010. The problem is that taxpayer's appraiser applied that well-supported depreciation figure to a figure for cost of construction that already includes a loss for the builder to the extent of overhead costs and foregone profits. As such, little weight can be given to the conclusion of value from the cost approach of taxpayer's appraiser.

The county's appraiser, on the other hand, based his cost approach on cost data procured from *Marshall & Swift*, a commercially available source for estimated building costs of a sort commonly used by experts in this field. Using this resource, the county's appraiser constructed two alternative scenarios for cost of construction—one for each of the two quality classes found in *Marshall & Swift* that the house arguably falls within. These two alternative scenarios place a value on the house of $880,089 (if the house is considered "Single Family Residence Class D / Excellent") or $1,349,066 (if the house is considered "High Value Residence Class 3"). Inasmuch as the "High Value Residence Class 3" scenario substantially exceeds the value that the county seeks to uphold, the court will focus on the county's "Single Family Residence Class D / Excellent" scenario.

Taxpayer objects to the county's reliance on *Marshall & Swift* on the ground that where, as here, the costs of construction are known, they should prevail over estimates like those contained in *Marshall & Swift*. This argument fails because, as stated above, the $714,000 figure relied upon by taxpayer does not represent the actual cost of building the subject house. That actual cost includes an amount for the builder's overhead and profit that taxpayer did not include in its $714,000 figure. That deficiency eliminates any ground for privileging the figure given by taxpayer over the estimated cost of construction provided by the county.

However, the county's cost approach is flawed in its own way. The county's appraiser did not undertake any depreciation of the cost of construction estimate derived

from *Marshall & Swift*. "Depreciation" in this context takes in both physical wear and tear and changes in market conditions that impair the salability of real property or improvements. *The Appraisal of Real Estate* at 576-77. This is noteworthy because the testimony of the county's appraiser generally supports the conclusion that the real estate market in Lane County featured significant depreciation as of January 1, 2010.

In short, neither party presented the court with a complete cost approach analysis. Taxpayer's analysis omitted significant costs of construction for the subject property. The county included those costs, but did not make any accounting for depreciation. The court will revisit this issue below.

B.   *The Comparable Sales Approach*

Both taxpayer's appraiser and the appraiser for the county also presented conclusions as to the value of the subject house using the comparable sales approach. The RMV of property at a given point in time can be determined by analysis of sales of other similar properties at about the same time.

Both taxpayer and the county rely upon substantially the same comparable sales in reaching their respective conclusions as to the value of the subject house. However, the comparable sales approach of the county's appraiser suffers from a serious flaw. The county's appraiser did not, in his comparable sales approach, partition land value from improvements value on any of the properties that the county's appraiser used for comparable sales. (Trans at 86-87.) At trial the county's appraiser admitted that this was a mistake on his part and that properly accounting for land value would produce a significant change in RMV. This failure to look at the value of the house as a discrete item, and to compare it to the value of other comparable houses as discrete items, severely reduces the usefulness of the comparable sales approach of the county's appraiser.

The county argues that if the land component of each comparable sale can be shown to be comparable, that

land value can be extracted from the overall value of each supposedly comparable sale, leaving only the improvement value for comparison to the house at issue in this case. However, this argument fails because the county's appraiser did not analyze the land values of these supposedly comparable properties so that they could be extracted from the overall values of the comparables. Under these circumstances, the court cannot give any weight to the comparable sales approach of the county.

Taxpayer's comparable sales approach, on the other hand, does at least attempt to value the house through reference to sales of comparable houses. The county takes issue with the adjustments that taxpayer's appraiser made to the values of the comparable properties. However, even if, for the sake of argument, these objections of the county are granted, the court is left with a partially deficient comparable sales approach by taxpayer's appraiser opposing a completely deficient comparable sales approach by the appraiser for the county.

However, the sales comparison approach on the whole is of limited use in this case. As the appraisers for both parties acknowledge, the sales comparison approach is not ideal for valuing property in an inactive market. Both parties presented evidence tending to show that the real estate market in Lane County on and about January 1, 2010, suffered from just this sort of inactivity. Both of these considerations point to the cost approach as the preferred method of finding the value of the subject property.

## C.   *The Cost Approaches of the Parties Revisited*

The court found above that the cost approaches provided by the appraisers for both parties each have their own failings. In the case of the cost approach of taxpayer, that failing is the omission of any amount in the cost calculation for the builder's overhead and profits. In the case of the cost approach of the county, the failing is the omission of any amount of depreciation. Interestingly, each party's cost approach supplies a credible figure where the cost approach of its opponent is lacking.

"When the determination of [RMV] \* \* \* is an issue before the tax court," the court may determine RMV "without regard to the values pleaded by the parties." ORS 305.412. With that in mind, the court concludes that the $880,089 figure given by the county for cost of construction is correct. From that figure, however, an amount must be subtracted to account for depreciation. Taxpayer argues that the appropriate amount ranges from 8 to 16 percent, with most of the evidence leaning toward the 16 percent depreciation figure. The county's appraiser did not deduct any depreciation in his appraisal report, but did provide time-trend analysis and testimony that generally supports taxpayer on this point. Applying the 16 percent depreciation figure provided by taxpayer to the county's $880,089 figure for cost of construction produces an RMV for the subject house on January 1, 2010, of $739,275.

## V.   CONCLUSION

Based on the presentations of the parties, the court concludes that the RMV of the subject house was $739,000 (rounded) on January 1, 2010. Now, therefore,

IT IS THE DECISION OF THIS COURT that the RMV of the subject house was $739,000 on January 1, 2010.