IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PASTEGA INVESTMENT COMPANY ) 
LLC, )
 )
          Plaintiff, ) TC-MD 150285N
 )
     v. )
 )
BENTON COUNTY ASSESSOR, )
 )
          Defendant. ) **FINAL DECISION**

This Final Decision incorporates the court's Decision, entered April 18, 2016. In response to directions contained in that Decision, Plaintiff filed a letter on April 25, 2016, stating that a tax reduction would result from a reduction of the subject property's 2014–15 real market value to $390,000. Accordingly, section E of this Final Decision's analysis has been updated. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appeals property identified as Account 403553 (subject property) for the 2014-15 tax year. A telephone trial was held on January 11, 2016. Jamie E. Stanton, Attorney at Law, appeared on behalf of Plaintiff. Daniel R. Orman (Orman), Certified General Appraiser, testified on behalf of Plaintiff. Richard D. Newkirk (Newkirk), Registered Appraiser, appeared and testified on behalf of Defendant. Plaintiff's Exhibit 1 and Defendant's Exhibit A were received without objection. Plaintiff objected to the relevance of Defendant's Exhibit B, a 2011 appraisal report prepared by Orman for another Corvallis property, and the court excluded that exhibit. Plaintiff objected to Defendant's Exhibit D, which was not timely exchanged pursuant to Tax Court Rule-Magistrate Division 12 C(1)(a), and the court excluded that exhibit. The parties filed written closing arguments on January 16, 2015. Plaintiff filed a Response to Defendant's

Closing Argument on January 26, 2016, to correct two errors and object to improper arguments on facts not in evidence. Defendant filed its Response February 1, 2016.

## I. STATEMENT OF FACTS

A.      *Subject Property Description and Market*

Orman testified that the subject property is a 13,939 square foot site with a 3,550 square foot structure, comprised of 1,350 square feet of office (38 percent) with the balance warehouse space. (Ptf's Ex 1 at 18-19.) He testified that the subject property structure is concrete block construction built in 2000 and also includes 704 square feet of open-sided, unfinished mezzanine space. (*Id.* at 19.) Orman testified that the subject property has a parking lot and a small yard. (*Id.* at 20.) He testified that the subject property's site coverage is about 25 percent, which is typical for the market; it has no excess or surplus land. (*Id.* at 19.) Orman testified that the subject property is average to good quality and condition for its age. (*Id.* at 20.) He testified that the subject property office space is good quality with nice finishes; it has air conditioning, heating, and a fireplace. (*Id.* at 19-20.) Orman testified that the warehouse is average. He testified that he considered the unfinished mezzanine space an amenity, not additional rentable space. Orman determined that the subject property has "average to good" access and "average" exposure. (*Id.* at 18.) The subject property is zoned General Industrial (GI). (*Id.*)

Orman described the subject property's market area as follows:

> "[it] is part of a mixed use commercial, industrial, and residential district. This area is in the northeast quadrant of the City and is generally bounded by Highway 99W on the west, Highway 20 on the east, NE Circle Boulevard on the south, and Conifer Boulevard on the north. The commercial development in this area is anchored by a Big-K department store and Safeway grocery store."

(Ptf's Ex 1 at 13.) "Located behind the Big K and Safeway (to the south) is a 17.57 acre parcel that was developed with a Home Depot in 2007. Part of this larger parcel is three smaller lots

zoned for industrial use. One of these lots was recently improved with a vehicle storage lot for the US Forest Service; the other two lots are available for sale." (*Id.*) The Hewlett-Packard campus "is located along NE Circle Boulevard, between Highway 99W and Highway 20." (*Id.* at 14.) "Near the intersection of NE Walnut Boulevard and Belvue Street are industrial developments. This would include Pepsi-Cola distribution facility, Sprick Roofing, a mini-storage, and a warehouse building." (*Id.*)

Newkirk testified that he and Orman generally agree on the overall physical description of the subject property. He testified that the subject property is surrounded by the property at issue in *Pastega Investment Company LLC v. Benton County Assessor*, TC-MD No 150284N. (*See* Def's Ex A at 7, 15.)

B.      *Subject Property Ownership History and Sale*

Orman testified that he was retained by Mario Pastega (Pastega) in 2008 to provide market research to assist Pastega with a pending purchase of the subject property and another parcel of land. On November 6, 2009, Pastega purchased the subject property and "another abutting 3.70 acre industrial zoned parcel" for a total of $900,000.[1] (*See* Ptf's Ex 1 at 6.) Orman testified that Pastega allocated $336,000 to the subject property, although the deed reported a price of $475,000. (*See* Def's Ex A at 17.) He testified that he did not know why that discrepancy occurred. Orman concluded that Pastega's purchase in 2009 was arm's-length. (*See* Ptf's Ex 1 at 6.)

Newkirk wrote that, based on his research, "[t]here have been three (3) Deed recordings relative to the subject property over the past ten (10) years." (Def's Ex A at 17.) In 2006, a deed

---

[1] The 3.70 acre parcel of industrial land is part of the property at issue in *Pastega Investment Company LLC v. Benton County Assessor*, TC-MD 150284N, and is described in that Decision. Pastega reportedly purchased the 3.70 acre parcel of land for $3.50 per square foot, or $564,100, rounded.

transferred fee simple title from Robert C. Wilson to RCW Properties LLC, an entity owed by Wilson. (*Id.*) In 2009, a deed transferred fee simple title from RCW Properties LLC to Pastega for $475,000. (*Id.*) In 2012, a deed transferred fee simple title from Pastega to Pastega Investment Company (Plaintiff), an entity owned by the heirs of Pastega. (*Id.*) Newkirk testified that Defendant confirmed the 2009 sale with Pastega. (*See id.* at 17, 65-66.)

C.      *Plaintiff's Valuation of the Subject Property*

Orman testified that he has 27 years of experience with commercial and industrial appraisals and has run his own commercial appraisal business in Corvallis since 2008. (*See* Ptf's Ex 1 at 51.) He testified that he concluded the subject property's highest and best use as improved was its current use. (*See id.* at 25-26.) Orman testified that he considered all three approaches to value, but did not use the cost approach because the comparable land sales were limited and it is difficult to estimate depreciation. (*Id.* at 27.) He testified that the subject property is not new or relatively new. Orman testified that he completed an income approach because income and value are closely related; although the subject property is owner-occupied, it could be leased.

1.      *Income Approach*

Orman identified four comparable leases from the Corvallis market. (*See* Ptf's Ex 1 at 29.) The properties were built between 1978 and 1997 and ranged in size from 1,500 to 5,433 square feet. (*Id.*) Orman testified that all of his comparable leases, except for lease 4, were from the south Corvallis market, but he did not make any location adjustments. (*See id.* at 30.) He testified that lease 4, located in north Corvallis, was the lowest value indicator. (*See id.* at 29-30.) Lease 1 was a five-year lease for $0.46 per square foot per month, modified gross, that began in February 2013. (*Id.* at 29.) Lease 2 was a two-year lease for $0.83 per square foot per

month, modified gross, that began in July 2012. (*Id.*) Lease 3 was a three-year lease for $0.49 per square foot per month, modified gross, that began in June 2011. (*Id.*) Lease 4 was a five-year lease for $0.37 per square foot per month, triple net, that began in January 2010. (*Id.*)

Orman acknowledged that each of his comparable leases was "slightly dated" and "leased at a time when market conditions were much softer than today (Jan-2014)[,]" so he made an upward adjustment of four percent per year for time. (Ptf's Ex 1 at 33.) He testified that he calculated a four percent annual time adjustment based on the typical lease rate increase of two to three percent with a small additional adjustment to reflect market appreciation. Orman also made an upward adjustment of $0.08 per square foot per month to lease 4 to adjust it from triple net to modified gross. (*Id.*) He found adjusted monthly lease rates ranging from $0.48 to $0.88 per square foot. (*Id.*) Orman concluded a lease rate for the subject property of $0.80 per square foot per month, modified gross. (*See id.*)

Orman testified that he used a five percent allowance for vacancy and credit loss, which is typical for the market. (*See* Ptf's Ex 1 at 33-34.) He calculated expenses of $8,804, including property taxes of $6,076, and reached a net operating income of $23,572. (*See id.* at 34-35.) Orman reviewed six comparable sales, which indicated capitalization rates ranging from 6.83 to 7.94 percent, and selected a rate of 7.25 percent for the subject property. (*See id.* at 35.) He concluded a real market value of $325,000 under the income approach. (*Id.*)

2.      *Sales Comparison Approach*

Orman testified that he tried to find properties similar to the subject property with respect to size, age, site coverage, and mix of office and warehouse space. (*See* Ptf's Ex 1 at 37.) He testified that would have preferred to use only comparable sales from the Corvallis market, but had to expand his search because there were not enough comparable sales in Corvallis close to

January 1, 2014. (*See id.* at 37-38.) Orman selected six comparable sales: one in Corvallis, three in Albany, one in Salem, and one in Eugene. (*Id.* at 39.) He testified that Albany is about 11 miles from Corvallis, and he considers Salem and Eugene to be alternate markets to Corvallis. Orman made an adjustment to his sale 2 for "several smaller items of deferred maintenance costing $15,000." (*Id.* at 37.) He noted that sales 3, 4, 5, and 6 were "slightly dated" so he adjusted them by four percent per year to January 1, 2014. (*Id.* at 37-38.)

Orman determined that his sales 1, 3, 4, and 5 were each low value indicators. (Ptf's Ex 1 at 38-39.) Those properties were all located in Albany or Salem and sold for adjusted prices ranging from $56.01 to $67.52 per square foot. (*Id.*) Orman concluded his sale 2, located in Corvallis, was a "reasonable to high" value indictor due to its superior "location near central Corvallis and OSU" and its "2,000 SF finished mezzanine that is an added amenity." (*Id.*) It sold for an adjusted price of $108.82 per square foot. (*Id.*) Newkirk questioned why Orman concluded sale 2 was a high value indicator given that all of its physical attributes were inferior to the subject property. (*See id.*) Orman responded that the location and mezzanine were superior. Orman determined that his sale 6, with an adjusted price of $97.90 per square foot, was a "slightly high" value indicator. (*Id.*) Orman testified this sale 6 was very similar to the subject property with respect to its physical attributes. (*See id.*) It was located in Eugene and had "more land (relative to its building size) and a significantly higher percentage of office space." (*Id.*) Orman concluded an indicated real market value of $95 per square foot, or $337,000, for the subject property under the sales comparison approach. (*Id.* at 45.)

/ / /

/ / /

/ / /

3.    *Reconciliation*

Orman testified that he placed the most weight on the sales comparison approach because the subject property is owner occupied.  (*See* Ptf's Ex 1 at 46.)  He testified that he concluded a real market value of $337,000 for the subject property as of January 1, 2014.  (*See id.*)

D.    *Defendant's Valuation of the Subject Property*

Newkirk has been an Oregon registered appraiser since 2002 and was previously a certified general appraiser in Missouri.  (Def's Ex A at 61.)  He did not complete his highest and best use analysis of the subject property as improved.  (*See id.* at 19.)  Newkirk utilized all three approaches to value.  (*See id.* at 20.)

1.    *Cost Approach*

Newkirk testified that, in his cost approach land valuation, he relied primarily on the June 2006 sale of 11.08 acres of industrial land to develop a Home Depot.  (*See* Def's Ex A at 20-22.)  That parcel sold for $6.73 per square foot.  (*Id.* at 22.)  He testified that he provided market data to demonstrate that the market conditions at the time of the 2006 Home Depot sale were similar to January 1, 2014.  (*See id.* at 31-33.)  Newkirk testified that he also considered four land listings and one other land sale.[2]  (*See id.* at 29.)  He testified that the subject property was smaller than all of his comparable land sales and listings, so he made qualitative adjustments to account for that difference; he considered the subject property superior due to its smaller size.  Newkirk testified that he thought the subject property was superior to sales 1 and 6, about equal to listings 2 and 3, and inferior to listings 4 and 5.  (*See id.*)  He testified that he concluded a value of $9.50 per square foot, or $135,000, for the subject property land.  (*See id.* at 33.)

/ / /

---

[2] For a more detailed description of Newkirk's market data, land listings, and land sale, see *Pastega Investment Company LLC v. Benton County Assessor*, TC-MD 150284N at 5-7.

Orman testified that Newkirk's land sale 1 for the Home Depot development was negotiated in 2002. He testified that land listings 2 and 3 had been listed since 2006 and land listings 4 and 5 were 14 to 15 years old. Plaintiff's counsel asked Newkirk why he relied on land listings that had been on the market in excess of 24 months, given his conclusion that the likely marketing time for the subject property would be 12 to 24 months. (*See* Def's Ex A at 18.) In response, Newkirk acknowledged that those listings might not be priced to sell.

Newkirk testified that he used Marshall & Swift Valuation Service to calculate the subject property's improvement value. (*See* Def's Ex A at 34-36.) He selected 10 percent indirect costs and 15 percent entrepreneurial profit and overhead. (*Id.* at 35-36.) Newkirk testified that he applied 13 percent depreciation based on a depreciation table, and determined a depreciated improvement value of $382,224. (*See id.* at 36.) He testified that he added the land and improvement values together for a total real market value of $514,645 under the cost approach. (*Id.* at 37.) Newkirk rounded that real market value conclusion to $510,000. (*Id.*)

2.　　*Sales Comparison Approach*

Newkirk searched for sales of properties similar to the subject property and ultimately selected five sales. (Def's Ex A at 38; 47.) Newkirk testified that his sale 1 was the 2009 sale of the subject property, based on the recorded deed price of $475,000. (*See id.* at 41; 47.) He testified that sales 2, 4, and 5 were located in Salem, Oregon, and sale 3 was located in Corvallis and purchased by Oregon State University (OSU). (*See id.* at 37-49). Newkirk did not make any quantitative adjustments to his sales. (*See id.*) His sales indicated a value range of $82 to $120 per square foot. (*Id.* at 47.) Newkirk placed the most weight on sales 1, 3, and 4. (*Id.* at 49.) Sale 3 was a 12,500-square foot building constructed in 1999 that sold for $120 per square foot in February 2010. (*Id.* at 47-48.) Sale 4 was a 3,384-square foot building constructed in 1992

that sold for $118 per square foot in August 2015.  (*Id.*)  Newkirk concluded a value of $120 per square foot for the subject property.  (*See id.* at 49.)  He testified that he initially calculated an indicated real market value of $510,000 under the sales comparison approach, but revised that value at trial to $426,000 because he had erroneously included the subject property's unfinished mezzanine space in his calculation.  (*See id.*)

3.      *Income Approach*

Newkirk testified that he identified four comparable leases: one in Corvallis; one in Tangent, which is near Corvallis; and two in Salem.  (*See* Def's Ex A at 50-51.)  His comparable leases indicated a rental range of $11.40 to $14.40 per square foot per year, or $0.95 to $1.20 per square foot per month.  (*See id.*)  Each of his comparable leases was triple net, with the exception of lease 3, at $11.40 per square foot, which was modified gross.  (*Id.* at 51.)  Newkirk testified that he did not make any adjustments to his comparable leases.  Orman testified that Newkirk's lease 1 was from 1999.  Newkirk testified that lease 2 was from September 2006.  He testified that he did not know the date of lease 3.  Newkirk testified that he did not know the percentage of office space of lease 4.

Newkirk selected rent of $11.50 per square foot per year, or $0.96 per square foot per month, for the subject property.  (Def's Ex A at 57.)  He testified that he concluded a vacancy rate of 11.30 percent based on CoStar statistics for Oregon.  (*See id.* at 57.)  Newkirk testified that he thought the subject property would be leased triple net, so he did not include property taxes in his expenses.  (*See id.*)  He selected a capitalization rate of 7.30 percent and determined an indicated real market value of $503,124 under the income approach.  (*Id.*)  Newkirk testified that he revised his income approach real market value conclusion to $470,000 to correct for the square footage error that also affected his sales comparison approach conclusion.

4. *Reconciliation*

Newkirk wrote: "In summary, no one approach stands out as clearly superior to the others. However, the cost and sales comparison approaches are a relevant indicator of value due to the quantity and quality of available market and cost data." (Def's Ex A at 59.) He found the income approach to be "supportive," but gave it "minimal weight." (*Id.* at 58.) Newkirk initially concluded a reconciled 2014-15 real market value of $510,000 for the subject property. (*Id.* at 59.) He testified that he revised his reconciled 2014-15 real market value conclusion to $430,000 based on the revisions to his sales comparison and income approach conclusions.

E. *Tax Roll Values*

The subject property's 2014-15 tax roll real market value was $595,134, and its 2014-15 maximum assessed value was $358,503. (Compl at 2.) The board of property tax appeals reduced the subject property's 2014-15 real market value to $495,008. (*See id.*)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2014-15 tax year. ORS 308.205(1) defines real market value:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[3]

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; 308.210.

There are three approaches to value that must be considered to determine the real market value of real property: the sales comparison approach, the cost approach, and the income approach. *See* OAR 150-308.205-(A). In a particular case, all three approaches may not be applicable; however, each approach "must be investigated for its merit." *Id.* Whether any one

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

approach is more persuasive in a given case "is a question of fact to be determined by the court" based on the record before it. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979). In addition to the three approaches to value, a recent sale of the subject property "is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973).

Plaintiff bears the burden of proving its case by a preponderance of the evidence. *See* ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). To meet its burden, Plaintiff must "provide competent evidence of the [real market value] of [its] property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Competent evidence of real market value "includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D, WL 879285 (Mar 13, 2012).

A. *The Sale of Part of the Subject Property*

Under *Kem*, a recent, voluntary, arm's-length sale of the subject property provides persuasive evidence of the subject property's real market value. Pastega purchased the subject property in 2009. However, the parties do not agree on the sale price associated with that transaction. The recorded deed listed the sale price as $475,000, and Newkirk relied upon the recorded deed. Orman testified that, based on his conversations with Pastega, the sale price was $336,000. He could not explain why the deed reported the sale price as $475,000. For purposes

of this analysis, the court accepts as correct Orman's testimony regarding the subject property's 2009 sale price.

The subject property's sale in November 2009 was not "recent" as of January 1, 2014. That sale occurred over four years before the January 1, 2014, assessment date, during the recession that began in 2008. (*See* Ptf's Ex 1 at 13.) In his sales comparison approach, Orman determined that an upward time adjustment of four percent per year was necessary to adjust his comparable sales from 2011 to 2013 to the January 1, 2014, assessment date. It follows that the subject property sale must also be adjusted upward to January 1, 2014. Using Orman's time adjustment of four percent per year indicates a time-trended value of approximately $390,000. Ultimately, the court gives limited weight to the subject property sale in November 2009 because the sale was not recent and because of the unexplained discrepancy regarding the sale price.

B.      *Cost Approach*

"The cost approach assumes that the cost of construction--and thus the cost of building a substitute property with similar features--influences the value of real property. The cost of construction includes both the direct and the indirect costs and is assumed to represent a 'ceiling' on value, as a purchaser of real property is unlikely to pay more for an existing property than it would cost to build substantially similar property." *Betz Evans Associates v. Dept. of Rev.*, 21 OTR 461, 464 (2014), citing Appraisal Institute, *The Appraisal of Real Estate* 561 (14th ed 2013). "In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006), citing Appraisal Institute, *The Appraisal of Real Estate* 63 (12th ed 2001). "The cost approach is 'particularly useful in valuing new or nearly new

improvements,' " but is "less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Id.*, citing *The Appraisal of Real Estate* at 63.

Orman did not complete a cost approach due to the age of the subject property. Newkirk determined an indicated value of $510,000 under the cost approach. The subject property was 14 years old as of the January 1, 2014, assessment date. That is not new or nearly new. As a result, Newkirk's value determination under the cost approach--particularly depreciation--is less reliable. Moreover, the court does not agree with Newkirk's determination that the land value is well supported in this case. Newkirk determined the subject property's land value based upon two land sales and four listings. The land sale that he relied upon primarily was a June 2006 sale of 11.08 acres. That sale was of a parcel significantly larger than the subject property that occurred over seven years before the January 1, 2014, assessment date. Listings are not "actual market transactions * * *." OAR 150-308.205-(A)(2)(c). For those reasons, the court gives no weight to the cost approach in this analysis.

C.      *Income Approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen v. Dept. of Rev.*, 17 OTR 248, 253 (2003) (citations omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Id.* "[Net operating income] is the currently expected net income of a property after all operating expenses are deducted from gross income. * * * To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* at 254 (citation omitted).

/ / /

The subject property is owner occupied; it was not purchased by an investor for its income stream. However, Orman determined the income approach was relevant to the valuation of the subject property because it could be purchased by an investor and leased. He concluded an indicated value of $325,000 under the income approach. Newkirk also utilized the income approach and concluded an indicated value of $470,000.

The major flaw with Orman's income approach was his use of the subject property's actual property taxes as an expense. Indeed, property taxes comprised the majority of Orman's expenses: $6,076 out of $8,804. "This court has indicated a preference for an income approach that removes property taxes from expenses and uses a capitalization rate that includes an effective tax rate for property taxes." *Morse Hays LLC v. Benton County Assessor*, TC-MD 100697C, WL 2621890 at *5 (July 5, 2011). The appraiser must be careful not to duplicate the property tax expense by including it both as an expense and in the capitalization rate. *See Patterson v. Dept. of Rev.*, 13 OTR 320, 322 (1995). The court received no evidence of the effective tax rate for property taxes, so the court is unable to determine a revised value indication under the income approach.[4] The court finds that Orman's income approach value conclusion was likely understated due to its treatment of property taxes and gives it no weight.

Newkirk's income approach analysis fares no better. Newkirk provided little information about his comparable leases and, based on the testimony of Orman and Newkirk, at least two of Newkirk's four leases were significantly dated: 1999 and 2006. Newkirk did not make any adjustments for the expense structure of his leases. The court is unable to determine whether any of the leases used by Newkirk were comparable to the subject property and, as a result, finds that no weight should be given to Newkirk's income approach conclusion.

---

[4] The court observes that removing property taxes from expenses results in a net operating income of $29,648. Capitalized at 7.25 percent, that indicates a value of $409,000, rounded.

D.      *Sales Comparison Approach*

Both appraisers used the sales comparison approach to value the subject property. The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp. v. Lane County Assessor*, TC-MD 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). Under the sales comparison approach, "only actual market transactions of property comparable to the subject, or adjusted to be comparable" may be used and all sales "must be verified to ensure they reflect arm's-length market transactions." OAR 150-308.205-(A)(2)(c). To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *3 (Mar 26, 2003.)

Both Orman and Newkirk had to look outside of Corvallis for recent comparable sales. They each utilized sales in Salem and Eugene, and Orman used three sales in Albany. Orman relied upon six comparable sales, with adjusted prices ranging from $56.01 to $108.82 per square foot. He determined the subject property's real market value was $95 per square foot, slightly less than the adjusted sale prices of his comparable sale located in Eugene, which was $97.90 per square foot. Newkirk's sales indicated a value range of $82 to $120 per square foot, and he determined the subject property's real market value was $120 per square foot.

This court has previously observed that real market value is a range rather than an absolute. *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977). The sales comparison approach evidence presented by Orman and Newkirk indicates that the subject property's real market value is within the range of $95 per square foot, or $337,000, and $120 per square foot, or $426,000. The court is not persuaded that the subject property's real market value was $337,000 as of January 1, 2014, given that the subject property sold for $336,000 in November 2009. As Orman discussed

in his appraisal report, the recession of 2008 impacted the prices of industrial properties. For sales that occurred during 2011 to 2013, Orman calculated an upward time adjustment of four percent per year. When that time trend is applied to the subject property's November 2009 sale price, it indicates a real market value of $390,000, which is within the value range supported by the sales comparison approach.

E.      *Reconciliation; ORS 305.275(1)(a)*

The parties agree that the subject property was overvalued for the 2014-15 tax year. In order to determine the subject property's correct real market value, the court gives primary weight to the sales comparison approach and limited weight to the time-trended sale of the subject property in November 2009. The court gives no weight to the cost and income approaches. The court finds that the subject property's real market value was $390,000 as of January 1, 2014.

For the court to order a change in real market value to the tax roll, Plaintiff must be aggrieved. ORS 305.275(1)(a). To be aggrieved, the ordered change to the tax roll must result in a property tax reduction. The subject property's 2014-15 maximum assessed value was $358,503. The parties were required to notify the court within 14 days of its Decision whether Plaintiff would receive a property tax savings if the subject property's 2014–15 tax roll real market value were reduced to $390,000. Plaintiff filed a letter on April 25, 2016, stating that a tax savings to Plaintiff would result from that change to the tax roll. The court did not receive any additional submission from Defendant. The court concludes that Plaintiff is aggrieved and it has authority to order a change in the tax roll real market value.

/ / /

/ / /

## III. CONCLUSION

After careful consideration of the testimony and evidence presented, the court concludes that the subject property's real market value was $390,000 as of January 1, 2014. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2014-15 real market value of property identified as Account 403553 was $390,000.

Dated this ___ day of May, 2016.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on May 6, 2016.*