IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

MACY'S DEPARTMENT STORES, INC,    )
                                  )
              Plaintiff,          )     TC-MD 180097R
                                  )
        v.                        )
                                  )
LANE COUNTY ASSESSOR,             )
                                  )
              Defendant.          )     **DECISION**

Plaintiff appealed a Board of Property Tax Appeals (BOPTA) Order for property

identified as Account 0249951 (subject property), mailed February 27, 2018, for the 2017-2018

tax year. A trial was held on April 25, 2019, in the courtroom of the Oregon Tax Court. Cynthia

M. Fraser of Foster Garvey, P.C. (then Garvey Schubert Barer P.C.), appeared on behalf of

Plaintiff. Jay F. Booth (Booth), Senior Managing Director of Valuation and Advisory for

Cushman & Wakefield, MAI, licensed commercial real estate appraiser, testified on behalf of

Plaintiff. Sebastian Tapia, Assistant County Council, appeared on behalf of Defendant. Joe J.

Lieck (Lieck), registered appraiser and appraisal supervisor, testified on behalf of Defendant.

Plaintiff's Exhibits 1, 3, 4, 8, 9, 10, 14, 15, 16, 20, 21, 22, 24, 26, and 32 were received without

objection. Defendant's Exhibit A was received over the Plaintiff's objection. Defendant's

Exhibits B, C, and D were received without objection.

## I. STATEMENT OF FACTS

The subject property is a two-story anchor department store at the Valley River Center

mall in Eugene, Oregon, constructed in 1969. (Def's Ex A at 2; Ptf's Ex 1 at 55.) Valley River

Center is a super-regional mall. (Ptf's Ex 10 at 1.) The parties stipulated that the subject

property is situated on 12.65 acres. (*Id*. at 49; Def's Ex A at 31.) The subject property consists

of 188,429 square feet[1]; the first floor is 108,252 square feet and the second floor is 80,177 square feet. (*Id*. at 55.) The subject property includes approximately 955 surface parking spaces— a parking ratio of 5.07 spaces per 1,000 square feet of gross leasable area.[2] (*Id*. at 55.)

A.      *Plaintiff's Appraisal*

Booth determined that the subject property is rated as "Class C" with an effective age of 25 years and a remaining economic life of 20 years. (Ptf's Ex 1 at 55-56.) Booth testified that the first floor has 97,073 square feet of selling space with multiple entrances from the parking lot and the mall. He testified that the second floor consists of 51,870 square feet of selling space accessible only from within the subject property by elevator or escalator. Booth's testimony emphasized the lack of functionality and low customer traffic on that floor. Booth testified that the second floor has a large storage space which was used as a restaurant many years ago.

Booth testified that Eugene is a smaller market with its primary economy derived from the University of Oregon, healthcare, and government employment. Booth found the Lane County retail market to have a slightly lower retail vacancy rate in the third-quarter of 2016 (3.9 percent) than the 5-year average of 4.8 percent. (Ptf's Ex 1 at 35.) Booth testified that the net absorption rate should be given importance because it will show the true demand in the market. (Ptf's Ex 1 at 35.) Booth testified that the retail landscape has been changing with the increasing e-commerce; online shoppers have taken away customer traffic in brick and mortar locations. He testified that when choosing comparable properties it is important to consider the category of store *e.g.* Big Box[3]

---

[1] Lieck's appraisal report stated that the total improvement square footage is 188,497. (Def's Ex A at 31.)

[2] Lieck's appraisal stated that the subject property has 835 parking spaces—that is a parking lot ratio of 4.44 spaces per 1,000 square feet of building space. (Def Ex A at 31.)

[3] Booth testified that Big Box retail stores specialize in one type of merchandise and tend to be free standing or in a Power Center not in a mall.

retail (*e.g.* Best Buy); Discount Department Stores (e.g. Target) and; Lifestyle Centers[4] (*e.g.* Bridgeport Village in Tigard, Oregon); a large anchor store in a regional mall, like the subject property, will have a smaller pool of potential tenants than would a smaller more flexible property.

Booth stated that "the most likely purchaser of the subject is the mall owner or other developer, who would typically rely on the Sales Comparison and Income Capitalization Approaches to value the property." (*Id*. at 65) On cross examination, Booth testified that he did not do a cost approach analysis for the subject property because it would be unclear of the depreciation due to the age of the building. He also testified that investors do not, generally use the cost approach on a property like the subject property.

1.      *Highest and best use*

The subject property is zoned C-2 for commercial use. (Ptf's Ex 1 at 62.) The subject property is bound by a reciprocal easement agreement (REA)[5] that "would appear to restrict the subjects use to a retail department store so long as the agreement remains in place." (*Id*.) Booth based his opinion of highest and best use on the zoning, the REA, the local market data, and the physical characteristics of the site. (*Id*. at 64.) Booth concluded that the subject property's highest and best use is as "a single-tenant department store building, as it is currently improved." (Ptf's Ex 1 at 64, 65.)

2.      *Sales comparison approach*

Booth testified that he had to expand the search nationally because there were no anchor department stores sales in the local area similar to the subject property. He testified that he

---

[4] Booth testified that Lifestyle Centers are a more modern trend filling a niche left by large regional malls. Its characteristics give the same sense of community as a mall but is usually open air.

[5] Plaintiff did not provide a copy of the REA to the court. Booth apparently reviewed the REA when preparing his appraisal report and discussed it at length.

compared the subject property to other anchor comparables with similar square footage and characteristics. For the comparative sales analysis, Booth selected five recent sales and used qualitative rather than quantitative adjustment. Booth explained that "while a matched-pair breakdown is the preferred method in analyzing sales, none of the comparables presented offers enough similarity from which to complete such an analysis and calculation." (Ptf's Ex 1 at 66.)

Sale 1, in August 2016, was the Sears at the Lloyd Center Mall in Portland, Oregon. (Ptf's Ex 1 at 67.) The gross leasable area (GLA) of the improvement is 143,000 square feet and it is situated on a 1.51-acre parcel. (*Id.*) It has a parking ratio of 3.89 spaces per 1,000 square feet. (*Id.*) A short-term lease-back to the current owner [three years remaining] was put into place pending closure of the store. He also testified that although the property was leased, the lease was terminable at any time and therefore it would not impact the price. Booth stated that market rent was paid for the lease-back. (Ptf's Ex 1 at 70.) This property sold for $80.42 per square foot to the mall owner. (*Id*. at 68.) Booth testified that it was an arms-length transaction because it was not part of a portfolio sale as many Sears stores were. Although Sale 1 was inferior in size to the subject property, Booth concluded that Sale 1 was overall superior to the subject property because of its superior location and population density. (Ptf's Ex 1 at 68.) Booth's adjusted sale price was $60.99 per square foot. (*Id.*)

Sale 2, in January 2016, was the Macy's at the Westfield Mission Valley Mall in San Diego, California, that sold for $43.11 per square foot. (Ptf's Ex 1 at 67.) The GLA of the improvement is 383,000 square feet and is situated on 3.58 acers. (*Id*.) It has a parking ratio of 5.51 spaces per 1,000 square foot. (*Id*.) Booth adjusted for market conditions, location, size, land to building ratio, and for "some uncertain influences due to a historic designation overlaid on the property." (*Id*. at 70, 73.) Booth concluded that this property "generally [has] superior

demographics relative to the subject * * * [and] warrants a more substantial location adjustment in comparison to the subject relative to other transactions on the chart." (Ptf's Ex 1 at 72.) Booth's adjusted sale price was $50.98 per square foot. (*Id*. at 68.)

Sale 3, in August 2015, was the Dillard's at the South Towne Center in Sandy, Utah. (Ptf's Ex 1 at 67.) The GLA of the improvement is 212,000 square feet and is situated on 12.76 acres. (*Id*.) It has a parking ratio of 4.07 spaces per 1,000 square feet. (*Id*.) It sold for $47.17 per square foot. (*Id*.) The property was built in 1997 which is much newer than the subject property. (*Id*.) Booth adjusted for market conditions, age and quality, and economic characteristics. (*Id*. at 68.) Booth concluded that Sale 3 is similar to the subject property, however, it is significantly newer than the subject and has a longer economic life. Booth's adjusted sale price was $49.08 per square foot.

Sale 4, in February 2015, was the Nordstrom at the Lloyd Center Mall in Portland, Oregon. (Ptf's Ex 1 at 67.) The GLA of the improvement is 130,000 square feet and is situated on 1.23 acres. (*Id*.) It has a parking ratio of 3.89 spaces per 1,000 square feet. (*Id*.) It sold for $57.69 per square foot. (*Id*.) Booth testified that the property was purchased by the mall owner and that the 3-level store was completely reconfigured for mall shop space. Booth adjusted for market conditions, location, size, age and quality, land to building ratio, and economic characteristics. (Ptf's Ex 1 at 68.) He found that the property was overall superior to the subject property. (*Id*.) Booth's adjusted sale prices was $51.93 per square foot.

Sale 5, in April 2014, was the Macy's at the Everett Mall in Everett, Washington. (Ptf's Ex 1 at 67.) The GLA of the improvement is 129,120 square feet and is situated on 10.80 acres. (*Id*.) It has a parking ratio of 5.79 spaces per 1,000 square feet. (*Id*.) It sold for $39.89 per square foot. (*Id*.) Booth testified that the mall that this property is located at is inferior to Valley

River Center, but somewhat similar. Booth testified that this property has a great location because it is visible from Interstate 5. Booth also testified that the purchaser of this property was an investor. There was a three-year lease left on the property with two 10-year options to renew. (*Id*.) Booth adjusted for market conditions, size, and economic characteristics. (Ptf's Ex 1 at 68.) Booth concluded that the property was similar to the subject property but overall is inferior. (*Id*.)) Booth's adjusted sale price was $51.93 per square foot. (*Id*.)

Booth concluded that Sales 3 and 5 were most similar to the subject property because they required fewer adjustments. Booth testified that the lowest net adjustments were to Sales 2, 3, and 4 with a range of $49 to $52 per square foot. He concluded that the January 1, 2017, "as is" value of the subject property was $50 per square foot or $9.4 million. (Ptf's Ex 1 at 73.) He testified that he would have arrived at the same conclusion if a lender was requesting this appraisal.

3.      *Income capitalization approach*

Booth considered six comparable department store rentals to determine market rent for the subject property. (*Id.* at 76.) Booth testified that, just as he had done with his comparable sales analysis, he had to look outside the local market and look nationally to find rent comparables similar to the subject property. The rent comparables range from 120,844 to 212,721 square feet. (*Id*.) The comparable rental value range is between $2.36 and $6.15 per square foot with an average of $4.13 per square foot. (*Id*. at 76.) The comparables leases have terms ranging from 10 to 18 years and most of them involve triple net leases. (*Id*. at 81.) After adjustments, the comparable leases range from $2.66 to $5.77 per square foot. (*Id*.) Booth's testified that comparables 1, 4 and 6 were the most similar in size to the subject property.

/ / /

Booth analyzed occupancy cost-to-sales ratio (OCS) and rent-to-sales ratio (RS). (Ptf's Ex 1 at 82-83.) Booth testified that OCS is calculated by taking the base rent paid—that is total occupancy cost including common area maintenance charges and real estate taxes—relative to sales performance. He testified that investment banks perform this calculation and emphasized that importance of this calculation to investors looking to purchase property similar to the subject property. Booth found that the department store occupancy cost in Oregon, Washington, and Idaho department stores located in malls typically support an average rent rate of $4.89 per square foot. (*Id*. at 83.) The RS study based on the sales performance of the subject property indicates a market rent for the subject property of between $3.18 and $5.41 per square foot. (*Id.* at 83-84.) Booth concluded that the average rental rate range for the subject property is between $3.25 to $4.75 per square foot and arrived at a market rent of $4 per square foot. (*Id*. at 85.)

To determine the appropriate capitalization rate, Booth reviewed numerous sources. Booth surveyed capitalization rates in the national market place, using the sales comparison properties as the mark for the subject property, suggesting a capitalization rate of 6.51 percent. (Ptf's Ex 1 at 92.) Booth testified that only the Macy's Everett, Washington, location was below market capitalization rate because of it having a below-market rent. (*See id*.) He found the capitalization rate range from net lease sales to be 5.95 percent to 8.91 percent, averaging 7.66 percent on a weighted basis. (*Id*. at 93.) He testified that the capitalization rate indicators on Cushman and Wakefield's data base include are center type, state, and sale price. He considered data extracted from The PwC Real Estate Investor Survey for competitive properties and found that the cap rate range was 5.25 percent to 9 percent with an average of 6.75 percent. (*Id*. at 94-95.) Booth also considered a mortgage-equity analysis because "[m]ost properties are purchased with debt and equity capital, therefore, the overall capitalization rate must satisfy the market

return requirements for both investments." (*Id*.) After considering comparable sales, PwC Investor Survey, and the mortgage-equity analysis, Booth selected capitalization rate of 7.75 percent for the subject property, resulting in an indicated value of $9.65 million for the subject property. (*Id*. at 99.)

4. *Reconciliation*

In reconciliation, Booth gave "relatively equal weight to the direct capitalization and sales comparison approaches." (Ptf's Ex 1 at 100.) He gave "primary weight to the Income Capitalization Approach, with supporting emphasis on the Sales Comparison Approach * * *" (*Id*.) At trial, he testified that he weighed the income capitalization approach slightly heavier than the sales comparison approach. Booth concluded a fair market value of $9.6 million for the subject property. (*Id*.)

B. *Defendant's Appraisal*

1. *Highest and best use*

Lieck concluded that the highest and best use of the subject property presents "no alternative uses that could reasonably be expected to provide a higher present value than the current use." (Def's Ex A at 33.)

2. *Land value and cost approach*

Lieck conducted a land valuation of the subject property. He testified that Lane County requires a valuation of the land separate from the improvement for the tax roll. This separate valuation is not part of the Sales Comparison or Income Capitalization Approaches. Lieck considered five land comparables to determine a range between $17.37 to $45.07 per square foot. (Def's Ex A at 36.) Lieck's land comparables supported a variety of uses including a Sears, a McGrath's Fish House, vacant land, and a Valley River Inn, all located in Eugene. (*Id*. at 35-

36.) The land comparables ranged in size from 1.12 acres to 8.78 acres. (*Id*. at 35-36.)

Defendant stated in its opening statement that "the value of the property is only as valuable as the land it sits on," asserting the value of the land alone is more valuable than the improvement. Lieck weighed comparable 4 heavily as the best indicator of value but also gave some weight to comparables 1 and 5. After weighing the relative similarities, he arrived at a land value range between $15 to $22 per square foot. (*Id*. at 36.) Lieck concluded the subject property's land value to be $10,469,646 or $19 per square foot. (*Id*.)

Lieck used Marshall and Swift Valuation Service to estimate a replacement cost new of $21,988,610 for the subject property improvements. (Def's Ex A at 38.) To that, he added entrepreneurial profit for a total replacement cost of $25,286,902. (*Id*.) Lieck's adjusted total cost estimate was $22,158,457, after applying local and cost modifiers, and a perimeter multiplier. (*Id*.) Lieck subtracted a further sixty-eight percent physical depreciation for both the first and the second floor, arriving at a building value of $7,206,202. (*Id*.) He testified that the improvement's economic life is fifty years old with five years of economic life remaining. Lieck determined a total improvement value of $7,538,176 and a total land value of $10,469,646, concluding a final value of $18,007,822. (*Id*.)

3. *Sales comparison approach*

Lieck selected seven[6] comparable properties for his analysis. (Def's Ex A at 39.) Comp #1 was the Macy's at the Stoneridge Mall in Pleasanton, California, which sold for $11,000,000. (*Id*. at 43.) Lieck testified that he did not know the date of sale on the property. Built in 1980, the improvement is 171,733 square feet, and in similar condition as the subject property. (*Id*. at

---

[6] Comparable #7 is a Macy's in Nampa, Idaho which is listed for sale at $9,585,000 but not sold as of the date the appraisal report was prepared.

40.)  He added that although the architecture to this property not unique like the subject property it is a Macy's.  Lieck testified that even though the property has a superior location, he determined it was the best comparable to the subject property and gave it the most weight among the sales analyzed.

Comps #2, #3, and #6 are similar in that they were part of portfolio sales.  (Def's Ex A at 43-44.)  Comp #2 is a Burlington Coat Factory located in Portland, Oregon, that is 168,838 square feet—19,591 square feet less than the subject property—and sold for $181.10 per square foot.  (*Id*. at 40.)  The sale date was not provided.  Lieck found the sales price to be on the "extreme high end."  (*Id*. at 43.)  In his report, Lieck designated Comp #2 as a "very high indicator" however, at trial he testified that Comp #2 was given little weight.  (*See id*.)  Comp #5 is a Fred Meyer located in Newberg, Oregon, that is 143,176 square feet—45,253 square feet less than the subject property.  (*Id*. at 41.)  It sold in November 2013, for $107.11 per square foot.  (*Id*.)  Lieck testified that it is a free-standing building with an inferior design that is not located in a major shopping center.  Lieck listed Comp #5 as a "High Indicator" of value for the subject property.  (*Id*. at 44.)  Comp #6 is a Linens N Things located in Portland, Oregon, that is 104,794 square feet—83,635 square feet less than the subject property.  (*Id*. at 43.)  It sold in July 2017, for $144.97 per square foot.  (*Id*. at 42.)  Lieck testified that it is similar in age and parking space as the subject property and is very similar to Comp #5.  Lieck listed Comp #6 as a "High Indicator" of value for the subject property in his appraisal report.  (*Id*. at 44.)

Comps #3 and #7 were given secondary weight in the sales comparison analysis and Comp #4 was given little to no weight.  (Def's Ex A at 43-44.)  Comp #3 is a Sears[7] located at Lloyd Center Mall in Portland, Oregon, that is 111,645 square feet which is 76,784 square feet

---

[7] Plaintiff also used this property in its Sales Comparison approach.  (See Ptf's Ex 1 at 67.)

less than the subject property. (*Id*. at 41.) It was part of a portfolio sale and purchased by the Lloyd Center Mall for redevelopment into a movie theater and other retail. (*Id*. at 43.) It sold in August 2016, for $103.01 per square foot. (*Id*. at 41.) Lieck noted that Comp #3 is ten years older than the subject property but of similar construction and quality but in a superior location. (*Id.* at 43.) Lieck testified that Comp #3 is a high indicator of value for the subject property. Comp #7 is a Macy's in Nampa, Idaho, that is 103,559 square feet—84,870 square feet less than the subject property. (*Id*. at 42.) Lieck testified it is a current listing with no sale information and was unsure of whether the listing existed as of January 2017. Comp #4 is a Macy's located in downtown Spokane, Washington. (*Id*. at 41.) Lieck testified that it has a completely different design and was sold for redevelopment as apartments. Lieck noted in his appraisal report that "the property was opened up for private bidding and was not an arm's-length transaction." (*Id*. at 43.) Lieck testified that it would not be a good comparable to determine the value of the subject property.

Lieck found that the sales comparison approach suggests a value range of $60-$85 per square foot. (Def's Ex A at 45.) Lieck concluded that $75 per square foot is the appropriate value resulting in a final total value of $14,137,275. (*Id*.)

4.      *Income capitalization approach*

Lieck considered seven comparable properties to determine market rent for the subject property. (Def's Ex A at 45.) Lieck testified that he stayed in the regional market to find rent comparables similar to the subject property. The comparables range from 83,260 to 205,623 square feet. (*Id*. at 46-48) The comparable monthly rental range is between $0.50 and $1.58 per square foot. (*Id*. at 50.) Comparable 5 was an estimated lease price and the rest of the comparables were based on listed lease rates. (*Id*. 46-48.)

Lieck gave the greatest reliance on lease Comparables 5 and 7 due to their similarity to the subject property, low adjustments, and location within the same Valley River Center as the subject property. (*Id.*) Lieck estimated a rent for comparable 5 because the property manager did not respond to his inquiries. (*Id.* at 49.) He testified that he gave Comparable 1 greater weight because it is a Macy's and similar to the subject property; although he determined in the rental analysis that it was only a "fair indicator" because the building is currently vacant. (*See also Id.*) He determined that comparables 2 and 3 are "somewhat applicable" to finding a lease rate for the subject property but required a downward adjustment for location and size. (*Id.* at 50.) Lieck testified that he gave Comparable 4 the least amount of weight. Lieck arrived at value range of $0.50 to $0.75 per square foot, after bracketing of comparables based on quantitative adjustments. (*Id.*) He ultimately selected a fair market rent of $0.55 per square foot on a triple net lease. (*Id.*)

Lieck determined that the vacancy rate trends for malls in the Eugene have varied between 11.7 percent in 2013, to 5.9 percent in 2017. (Def's Ex A at 50.) He testified that the trends for different property types show that malls are still viable and the market for a property like the subject is stable. Lieck concluded on a vacancy rate of five percent for the subject property noting that it had been 100 percent occupied since construction. (*Id.* at 51.) Lieck used a 10 percent expense rate reasoning that triple net leases are industry standard for properties of type and thus the expense to the landlord is relatively low. (*Id.*)

To arrive at an appropriate capitalization rate, Lieck surveyed capitalization rates in the local market place. (Def's Ex A at 52.) He considered data extracted from CoStar and other commercial real estate market trend reports for typical department store properties. (*Id.*) He found that higher quality "Class A" buildings in the Portland market had capitalization rates

ranging between 6.00 and 6.75 percent. (*Id*.) Lieck concluded that general trends overall suggest a capitalization rate of 6.75% for the subject property. (*Id*.) Lieck's indicated value, based on the income approach, for the subject property was $15,758,350. (*Id*. at 53.)

5. *Reconciliation*

In reconciliation, Lieck testified that he gave the Income Capitalization Approach the most weight, Sales Comparison Approach moderate weight and the Cost Approach the least amount of weight in the valuation analysis. Lieck allocated $4,530,354 to improvement value and $10,469,646 to land value arriving at an indicated total real market value of $15 million for the subject property. (Def's Ex A at 56.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2017–18 tax year. ORS 308.205(1)[8] defines real market value:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2017-18 tax year was January 1, 2017. *See* ORS 308.007; ORS 308.210. The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). There are three approaches to value that must be considered to determine the real market value of real property: the sales comparison approach, the cost approach, and the income approach. *See* OAR 150–308-0240(2). In a particular case, all three approaches may not be applicable; however, each approach "must be investigated for its merit." *Id*. Whether any one

---

[8] The court's references to the Oregon Revised Statutes (ORS) are to 2015.

approach is more persuasive in a given case "is a question of fact to be determined by the court" based on the record before it. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

Plaintiff bears the burden of proving their case by a preponderance of the evidence. *See* ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). To meet its burden, Plaintiff must "provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Competent evidence of real market value "includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC–MD 110300D, WL 879285 (Or Tax M Div Mar 13, 2012). Pursuant to ORS 305.412, this court has jurisdiction to determine the correct real market value of the subject property "without regard to the values pleaded by the parties."

A.    *Sales Comparison Approach*

"[T]he sales comparison approach relies on sale prices of other properties that can serve the same highest and best use as the subject property." *Hewlett–Packard Co. v. Benton County Assessor*, 357 Or 598, 603, 356 P3d 70 (2015). "[O]nly actual market transactions of property comparable to the subject property, or adjusted to be comparable may be used. All transactions must be verified to ensure they reflect arm's-length market transactions." OAR 150–308-0240(2)(c). To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC–MD 020869D, WL 21263620 (Or Tax M Div Mar 26, 2003).

Overall, the court finds Booth's sales comparison approach credible. The comparables chosen were similar to the subject property and appropriate adjustments were made for differences. The court finds that Sale 3 of the Dillard's at the South Towne Center for $49.08 per square foot with adjustments is the most comparable to the subject property.

With respect to Lieck's sales comparison analysis, the court notes that the sale prices range widely between $39.52 per square foot to $181.10 per square foot. Of the sales he identified as high to very high indicators, Comps #2, #5, and #6 were located in Power Centers and were 20,000 square feet to 84,000 square feet smaller than the subject property. Comp #5 is a Fred Meyer in Newberg Oregon and cannot fairly be considered comparable to the subject property. Sale 7 is a current listing of the Macy's in Nampa, Idaho. Listings are not "actual market transactions" and are given little weight in this analysis. OAR 150–308-0240–(2)(c). Comps #3 and #4 are significantly older than the subject property and were purchased with the intent of redevelopment for use other than a retail department store. The court is not persuaded that sales relied on by the county indicate the subject property's real market value of $75 per square foot. Lieck's conclusion as to a real market value of $14,137,275, is likely overstated.

B.      *Income Approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen v. Dept. of Rev.*, 17 OTR 248, 253 (2003). "The direct capitalization method used by both appraisers focuses on two key components: (1) the capitalization rate (cap rate) and (2) net operating income (NOI)." *Id.*

/ / /

/ / /

1.    *NOI*

"NOI is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Allen,* 17 OTR at 254.

The subject property is currently owner-occupied, so no lease information is available to analyze. To determine an estimated NOI, Booth relied primarily on data from the national market. Booth explained that he relied on the national market because an anchor retail department store's income could not be accurately determined with properties found in the local market. Booth's chosen properties are all similar to the subject property, with Comparable 1, a Macy's in Hayward, California, being most similar of size, age and area demographics. Booth's conclusions were further supported by the OCS and RS ratios used to rest the reasonableness of the subject property's rental estimates. The court is convinced that the properties that Booth relied upon in his income approach would serve as adequate substitutes for the subject property.[9]

Defendant used local lease comparables and his income estimates were based on the asking or list rent for these properties. Defendant's conclusion as to rent was significantly lower than Plaintiff's appraiser. The different in the outcomes is attributable to the cap rate applied.

2.    *Cap rate*

"A cap rate is generally calculated using market sales. Slight deviations in cap rates profoundly change the estimated value of a property, making the proper calculation of the rate of

---

[9] "The principle of substitution is fundamental to all three traditional approaches to value—sales comparison, cost, and income capitalization." The Appraisal of Real Estate at 31. "For an income-producing property, an equally desirable substitute might be an alternative investment property that produces equivalent investment returns with equivalent risk." *Id.*

paramount importance." *Allen*, 17 OTR at 260. Booth selected a cap rate of 7.75 percent from a range of 5.25 percent to 9 percent. Lieck selected a cap rate of 6.75 percent based on his opinion that the subject property was a "Class A" property. The court agrees with Booth's appraisal that a higher cap rate of 7.75 percent is supported for the subject property given its age, quality and market condition. At a cap rate of 7.75 percent and a net operating income of $746,179, the income approach indicates a real market value of $9,650,000.

C.    *Cost Approach*

> "The cost approach assumes that the cost of construction—and thus the cost of building a substitute property with similar features—influences the value of real property. The cost of construction includes both the direct and the indirect costs and is assumed to represent a 'ceiling' on value, as a purchaser of real property is unlikely to pay more for an existing property than it would cost to build substantially similar property."

*Betz Evans Associates v. Dept. of Rev.*, 21 OTR 461, 464 (2014), citing Appraisal Institute, *The Appraisal of Real Estate* 561 (14th ed 2013). "In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (citations omitted). "The cost approach is 'particularly useful in valuing new or nearly new improvements,'" but is "less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Id.* (citations omitted).

The court is not persuaded that the cost approach provides useful data for the subject property considering its age and condition. The subject property was 48 years old as of the assessment date with an estimated remaining economic life of 5 years. That is not new or nearly new. As a result, Lieck's value determination under the cost approach—particularly depreciation—is less reliable.

The court also finds Lieck's determination of land value of minimal utility. Lieck failed to consider that the subject property is bound by a reciprocal easement agreement (REA) that restricts the use of the subject property to a single tenant retail department store. The REA also requires that the parking lot remain open for general mall parking. Lieck's report did not include the dates that the sales occurred except one sale which reportedly occurred in 2013. The court also notes that the land comparables varied significantly in size from just over 1 acre to almost 9 acres. Lieck's weighted qualitative approach found land comparable 4 the most similar to the subject property. But, land comparable 4 is 5.3 acres, or 42 percent smaller than the subject property. To properly analyze the land component of property value, one must use properties subject to similar restrictions or make adjustments to address those issues. Lieck's analysis did neither. Based on the above, the court gives little weight to the cost approach for the valuation of the subject property.

D.    *Reconciliation*

The three approaches to value indicate that the subject property's real market value is in the range of $9.4 to $9.7 million, with the sales comparison and income approaches indicating a real market value at the lower end of the range, $9.4 to $9.6 million. Given that the subject property was approximately 48 years old the court gives little weight to the cost approach. The court finds that the values indicated by Booth under the sales comparison and income approaches carry more reliability because the comparable properties used in each approach were overall similar to the subject property. A real market value of $9.65 million is supported by the evidence. The court finds that the subject property's real market value was $9,650,000 as of January 1, 2017.

/ / /

III.  CONCLUSION

After careful consideration of the testimony and evidence presented, the court concludes that the subject property's real market value was $9,650,000 as of January 1, 2017.  Now, therefore,

IT IS THE DECISION OF THIS COURT that that the 2017-18 real market value of property identified as Account 0249951 was $9,650,000.

Dated this ____ day of January 2020.


_____
RICHARD DAVIS
MAGISTRATE


*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on January 24, 2020.*